**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA**

**CHARLESTON DIVISION**

BENJAMIN BRICKHOUSE,

        Plaintiff,

vs.

3M COMPANY, f/k/a Minnesota Mining
and Manufacturing Company;
AGC CHEMICALS AMERICAS, INC.;
ARKEMA, INC.;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT
COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CLARIANT CORPORATION;
CORTEVA, INC.;
DUPONT DE NEMOURS INC., f/k/a
DOWDUPONT, INC.;
DYNAX CORPORATION;
E.I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor
in interest to DuPont Chemical Solutions
Enterprise;
FIRE SERIVCE PLUS, INC.;
GLOBE MANUFACTURING
COMPANY, LLC;
HONEYWELL SAFETY PRODUCTS
USA, INC.;
JOHNSON CONTROLS, INC.;
LION GROUP, INC.;
L.N. CURTIS & SONS;
MALLORY SAFETY AND SUPPLY,
LLC;
MINE SAFETY APPLAINCES
COMPANY, LLC;
MORNING PRIDE MANUFACTURING
d/b/d HONEYWELL FIRST
RESPONDER PRODUCTS;

**MASTER DOCKET NO.: 2:18-MN-2873**
**CIVIL ACTION NO.:**  2:23-cv-04513-RMG

**JUDGE RICHARD GERGEL
DIRECT FILED
COMPLAINT AND JURY
DEMAND PURSUANT TO
CASE MANAGEMENT
ORDER NO. 3**

1

MUNICIPAL EMERGENCY SERVICES,
INC.
NATIONAL FOAM, INC.;
THE CHEMOURS COMPANY,
individually and as successor in interest to
DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to
DuPont Chemical Solutions Enterprise;
PBI PERFORMANCE PRODUCTS,
INC.;
PERIMETER SOLUTIONS, LP;
SPERIAN PROTECTIVE APPAREL,
USA, LLC;
STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS
USA d/b/a SOUTHERN MILLS, INC.;
TYCO FIRE PRODUCTS L.P.;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC.;
W.L. GORE & ASSOCIATES, INC.,

Defendants.

NOW COMES Plaintiff Benjamin Brickhouse ("Brickhouse" or "Plaintiff") by and through his attorneys, The Law Offices of F. Bryan Brice, Jr., for his Complaint against Defendant 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company, and other listed Defendants (collectively "Defendants") alleges, on knowledge as to his own actions, and otherwise upon information and belief, as follows:

**NATURE OF THE ACTION**

1.      This is a civil action for compensatory and punitive damages, costs incurred and to be incurred by Plaintiff, and any other damages that the Court or jury may deem appropriate for bodily injury arising from the intentional, malicious, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with Aqueous Film-Forming Foam ("AFFF"), and firefighter gear/uniforms, containing Perfluorooctanoic Acid ("PFOA") and

2

Perfluorooctanesulfonic acid ("PFOS"). All Defendants were involved in the manufacturing of the fluorochemical products or production and/or sale of firefighter turnout gear, the AFFF and/or the precursors to PFOA and PFOS (collectively hereinafter "fluorochemical products" or "C8") to which Plaintiff was exposed.

2.      Plaintiff Brickhouse had to medically retire in March 2021 after 16 and a half years of service as a firefighter with the City of Asheville Fire Department ("Asheville Fire Department"). During his service as a firefighter, Brickhouse was diagnosed with aggressive prostate cancer and later squamous cell carcinoma of the tongue base and lymphatic cancer.

3.      While serving the public as a firefighter, Plaintiff Brickhouse wore firefighting gear and used firefighting equipment treated and/or coated with materials containing and/or contaminated with one or more PFAS materials and was otherwise exposed to one or more PFAS materials, including from his exposure to AFFF foam, resulting in highly elevated levels of PFAS materials in his body and blood serum. Plaintiff Brickhouse received blood serum testing on April 25, 2022 at Grace Hematology & Oncology, finding elevated levels of PHSxS, PFOA, PFNA, and PFOS. Brickhouse was diagnosed with and treated for aggressive prostate cancer and squamous cell carcinoma of the tongue base and lymphatic cancer.

4.      Plaintiff Brickhouse brings this action to recover damages and appropriate injunctive and equitable relief for harm he suffered as a result of exposure to toxic per- and polyfluoroalkyl substances (collectively, "PFAS") to which Brickhouse was exposed throughout his career as a firefighter, without his knowledge or consent.

5.      PFAS were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by Defendants, individually or through their predecessors or subsidiaries. Plaintiff contends that as a direct and proximate result

of Brickhouse's exposure to PFAS chemicals they manufactured and/or distributed, Defendants are liable to Plaintiff for damages, including but not limited to, personal injuries and emotional distress.

6.     PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured end products to, inter alia, resist and repel oil, stains, heat, and water, and to resist corrosion. PFAS include "long-chain" PFAS made of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made of six or fewer carbon atoms ("short-chain PFAS").

7.     The human-made carbon-fluorine bonds that characterize PFAS chemicals do not exist in nature and are exceptionally strong. As detailed below, these toxic chemicals are present in firefighter uniforms, called turnout gear, and in Class B foam used for firefighting and training.

8.     Because PFAS can persist in the environment for 10,000 years or more, PFAS chemicals bioaccumulate and increase in concentration (bio magnify) up the food chain. Because PFAS do not readily degrade—and, when they do, tend to break down only into other PFAS— they are known as "forever chemicals."[1] PFAS exposure to humans can occur through inhalation, ingestion, and dermal contact.

9.     PFAS have been associated with multiple and serious adverse health effects in humans including cancer, liver damage, immunological and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, accelerated changes in gene expression, decreased fertility, pregnancy-induced hypertension, and other health conditions. PFAS chemicals pose

---

[1] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited November 2, 2022), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

4

significant human health risks even at extremely low concentrations and have also been shown to bioaccumulate in human blood, bones, and organs.

10.    Unknown to Brickhouse, Defendants have, either individually or through their predecessors or subsidiaries, knowingly and willfully manufactured, marketed, designed, sold, supplied, distributed, and/or used PFAS and PFAS-containing materials in protective clothing and uniforms specifically designed for firefighters ("turnout gear") as well as in Class B firefighting foams[2] for decades. These products were used by firefighters, firefighting training facilities, and fire departments across the United States, including in the State of North Carolina and the City of Asheville in Buncombe County, who were unaware of their toxicity.

11.    Defendants have long been aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Nevertheless, Defendants manufactured, designed, marketed, sold, supplied, and/or distributed PFAS and PFAS chemical feedstock[3] as well as firefighter turnout gear containing PFAS and Class B foam to firefighting training facilities and fire departments nationally, including the fire department in Asheville, North Carolina. Moreover, Defendants did so without informing firefighters or the public that the turnout gear and Class B foam contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS and PFAS-containing materials.

12.    Brickhouse wore turnout gear and used Class B foam in the usual and normal course of performing his firefighting duties and training throughout his career as a fire fighter, which

---

[2] Class B foams are synthetic, soap-like fluorosurfactant foams, the most common form of which is aqueous film forming foam ("AFFF"), that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors.
[3] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction. The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

exposed him to PFAS. He did not know, and, in the exercise of reasonable diligence, could not have known, that these products contained PFAS or PFAS-containing materials, nor could he have known that his exposure to these materials could and would cause serious negative health impacts.

13.     At all relevant times and continuing to the present, Defendants represented their turnout gear and Class B foam as safe, even though they knew or should have known that firefighters would repeatedly inhale, ingest, and/or have dermal contact with these harmful chemical compounds.

14.     Brickhouse's repeated and extensive exposure to PFAS through his routine and foreseeable use of use of Class B foam and turnout gear caused or substantially contributed to Brickhouse's developing adverse health conditions including hyperlipidemia, hypertension, aggressive prostate cancer, squamous cell carcinoma of the tongue base, and related symptoms, including anxiety, depression and emotional distress.

15.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of North Carolina when they knew or reasonably should have known that Brickhouse and other firefighters would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during the normal course of their work, training and emergency response, and that such exposure would threaten  the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

16.     As a direct and proximate result of PFAS exposure, Brickhouse suffered physical injury, emotional distress, and related damages, for which he is entitled to actual, compensatory, and punitive damages.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

18.    Plaintiff is filing this complaint as permitted by Case Management Order No. 3 ("CMO #3") issued by Judge Richard M. Gergel of this Court. Pursuant to CMO #3, Plaintiff designates the United States District Court for Western District of North Carolina as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391. But for CMO #3, venue is proper in the United States District Court for Western District of North Carolina in that the events, acts or omissions giving rise to the claim occurred in said district. Plaintiff respectfully requests that, at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for Western District of North Carolina.

19.    The United States District Court for the Western District of North Carolina has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the state of North Carolina for active use by users during the course of training and firefighting activities. Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Western District of North Carolina does not offend traditional notions of fair play and substantial justice.

## PARTIES TO THE ACTION
### PLAINTIFF

20.     Brickhouse is a citizen and resident of Henderson County, North Carolina. Brickhouse began his tenure at Asheville Fire Department in Buncombe County as a Firefighter Trainee in 2004. Throughout his 16 and a half years of service, Brickhouse was promoted to Senior Firefighter and later Firefighter Engineer. Brickhouse was known to diligently serve the public and his community, including through his desire to obtain advanced certifications.

### DEFENDANTS

21.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

22.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

23.      When reference is made in this complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of defendants, and did so while acting within the scope of their duties, employment or agency.

24.     At all times relevant to this litigation, upon information and belief, each of the defendants designed, developed, manufactured, marketed and/or sold the AFFF or 2:23-cv-04000-RMG Date Filed 08/11/23 Entry Number 1 Page 4 of 36 5 fluorochemical products containing PFOA or PFOS used by firefighters throughout the country, including in North Carolina.

25.     Each of the defendants designed, developed, manufactured, marketed and/or sold the AFFF or fluorochemical products containing PFAS, including PFOS, to which Plaintiff was exposed and directly and proximately caused Plaintiff to develop hyperlipidemia, hypertension, aggressive prostate cancer, squamous cell carcinoma of the tongue base, and related symptoms, including anxiety, depression and emotional distress.

26.     Defendants:

a.  Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Pau1, Minnesota 55144. On information and belief, 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS containing materials, and products containing PFAS in turnout gear and/or Class B foams in North Carolina. 3M does business throughout the United States and is registered to do business in North Carolina.

b.  Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 55 East Uwchlan Avenue, Suite 201 Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). On information and belief, AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. AGC does business throughout the United States, including in

North Carolina, and is registered to do business in North Carolina with the Secretary of State.

c.  Defendant Arkema, Inc. ("Arkema") is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. On information and belief, Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. On information and belief, Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Arkema does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

d.  BASF Corporation, ("BASF"), is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. 53. On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America. 54. On information and belief, BASF Corporation is the successor in interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., a Swiss specialty chemicals company, that manufactured fluorosurfactants containing PFOA used in AFFF.

e.  Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. On information

and belief, Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Buckeye does business throughout the United States, and is registered to do business in North Carolina.

f. Defendant Carrier Global Corporation ("Carrier") is a Delaware Corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier and manufactured and sold AFFF. Carrier does and/or has done business throughout the United States.

g. ChemDesign Products, Inc. is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143, that manufactured fluorosurfactants containing PFOA used in AFFF.

h. Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. On information and belief, Chemguard is a subsidiary of Johnson Controls, Inc. and developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.

i. Defendant Clariant Corporation ("Clariant") is a corporation organized under the laws of the State of New York, with its principal place of business located at 500 E.

Morehead Street, Suite 400, Charlotte, North Carolina 28202. On information and belief, Clariant developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Clariant does business throughout the United States and is registered to do business in North Carolina.

j.  Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2018, New DuPont spun off a new, publicly-traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, on information and belief, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. Corteva does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

k.  Defendant The Chemours Company ("Chemours") is a is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19898. Upon information and belief, in 2015, after Old DuPont spun off Chemours, Old DuPont merged with Old Dow and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities— including those relating to PFAS. Chemours does business throughout the United States, including in North Carolina.

l.  Defendant E. I. du Pont de Nemours and Company (i.e., "Old DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. On information and belief, Old DuPont has designed, manufactured, marketed, distributed, released, and sold fluorochemicals and/or fluorosurfactants containing perfluorooctanoic acid ("PFOA") and/or its precursors used to manufacture, market, distribute, release, and sell turnout gear and Class B foams, in North Carolina. Old DuPont does business throughout the United States, is registered to do business in North Carolina.

m.  Defendant DuPont de Nemours, Inc. (i.e., "New DuPont"), formerly known as DowDuPont Inc., is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with Old Dow and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities — including those relating to PFAS. New DuPont does business throughout the United States, including in North Carolina.

n.  Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. On information and belief, Dynax developed, manufactured, marketed, distributed, released, sold, and/or used

13

PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.

o. Defendant Globe Manufacturing Company, LLC ("Globe") is a corporation organized under the laws of the State of New Hampshire, with its principal place of business located at 37 Loudon Road, Pittsfield, New Hampshire 03263. Defendant Mine Safety Appliances Company acquired Globe Holding Company, LLC and its subsidiaries in 2017 and continues to do business under the Globe name. On information and belief, Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnouts and/or Class B foams, including in North Carolina.

p. Defendant W. L. Gore & Associates, Inc. ("Gore") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 555 Paper Mill Road, Newark, Delaware 19711. On information and belief, Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including in North Carolina. Gore does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

q. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 855 S Mint Street, Charlotte, North Carolina 28202. On information and belief, Honeywell and its affiliates, including Sperian Protection,

14

developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Honeywell does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

r.  Defendant Johnson Controls, Inc. ("Johnson Controls") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 5757 N Green Bay Avenue, Milwaukee, Wisconsin 53209. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. On information and belief, Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Johnson Controls does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

s.  Defendant Lion Group, Inc. ("Lion") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 7200 Poe Avenue, Dayton, Ohio 45414. On information and belief, Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.

t.  Defendant L.N. Curtis & Sons ("LN Curtis") is a corporation organized under the laws of the State of California, with its principal place of business located at 185

Lennon Lane, Walnut Creek, California 94598. On information and belief, LN Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including in North Carolina. LN Curtis does business throughout the United States, including in North Carolina.

u.  Defendant Mallory Safety and Supply, LLC ("Mallory") is a corporation organized under the laws of the State of California, with its principal place of business located at 3241 NW Industrial Street, Portland, OR 97210. On information and belief, Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Mallory does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

v.  Defendant Mine Safety Appliances Company, LLC ("MSA") is a corporation organized under the laws of the State of Louisiana, with its principal place of business located at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania 16066. Mine Safety Appliances acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. On information and belief, MSA/Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. MSA does business

throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

w.  Defendant Morning Pride Manufacturing, LLC d/b/a Honeywell First Responder Products ("Morning") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 1 Innovation Court, Dayton, OH 45414.  On information and belief, Morning developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Morning does business throughout the United States, including, North Carolina.

x.  Defendant Municipal Emergency Services, Inc. ("Municipal") is a corporation organized under the laws of the State of Nevada, with its principal place of business located at 12 Turnberry Lane, Fl. 2, Sandy Hook, Connecticut 06482. On information and belief, Municipal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Municipal does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

y.  Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. On information and belief, National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). On

information and belief, National Foam/Angus Fire developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. National Foam does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina with the Secretary of State.

z.   Defendant PBI Performance Products, Inc. ("PBI") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 9800-D Southern Pine Boulevard, Charlotte, North Carolina 28273. On information and belief, PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including in North Carolina. PBI does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

aa.  Defendant Perimeter Solutions, LP ("Perimeter") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at 8000 Maryland Avenue, Suite 350, Clayton, Missouri 63105. On information and belief, Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Perimeter does business throughout the United States, including in North Carolina.

bb. Defendant Sperian Protective Apparel, USA, LLC ("Sperian") is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business located at 1345 15th Street, Franklin, Pennsylvania 16323. On information and belief, Sperian developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Sperian does business throughout the United States, including in North Carolina.

cc. Defendant StedFast USA, Inc. ("StedFast") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 800 Mountain View Drive, Piney Flats, Tennessee 37686. On information and belief, StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including in North Carolina. StedFast does business throughout the United States, including in North Carolina.

dd. Defendant TenCate Protective Fabrics USA d/b/a/ Southern Mills, Inc. ("Tencate") is a corporation organized under the laws of the State of Georgia, with its principal place of business located at 6501 Mall Boulevard, Union City, Georgia 30291. On information and belief, Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout, including in North Carolina. Tencate does business throughout the United States, including in North Carolina.

2:23-cv-04513-RMG     Date Filed 09/07/23     Entry Number 1     Page 20 of 60

ee. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. On information and belief, Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (collectively, "Tyco/Ansul"). On information and belief, Tyco/Ansul has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, trained with, tested equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including at the Base. Tyco does business throughout the United States, including in North Carolina.

29.     Each named Defendant derived substantial revenue from the PFAS, PFAS materials and/or chemical feedstock, and products containing PFAS in Class B foam and /or turnout gear that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or sold within North Carolina, and Brickhouse used in a reasonably foreseeable manner in the course of conducting his firefighter duties.

30.     Defendants expected or should have expected that their acts would have consequences related to Brickhouse's use of turnout gear and foam within the State of North Carolina and Defendants derived substantial revenue from interstate commerce.

31.     Defendants purposefully availed themselves of the privilege of conducting business and activities within the State of North Carolina, thus invoking the benefits and protections of its laws.

## SUBSTANTIVE ALLEGATIONS

**I.     Plaintiff Brickhouse's Use of and Exposure to PFAS-Containing Products**

32.     Plaintiff re-alleges and incorporates by reference each of the above paragraphs of this Complaint as if fully set forth herein

33.     Brickhouse received his Plantation (FLA) High School diploma in 1980. He attended technical college, and prior to his tenure at Asheville Fire Department, he worked as a self-employed manufacturer's representative.  He then worked for the Town of Davie, Florida, including as a capital projects inspector.

34.     Plaintiff enrolled and was trained at the Broward County (FLA) Fire Academy, where he earned class leader status as he received his firefighting certification.  Prior to his training at the Fire Academy, he received his EMT national training and certification at Broward Community College.

35.     After finishing his firefighter training, Brickhouse began work as a Firefighter Trainee at the Asheville Fire Department on March 1st, 2004. Throughout his sixteen and a half (16 ½) years of service, Brickhouse was promoted to Firefighter Engineer. As a Firefighter Engineer, Brickhouse became certified to drive and control fire apparatuses.

36.     To prepare for this work, Brickhouse received extensive and ongoing training in fire prevention, and fire suppression that included the preparation and use of Class B foam, incident command, fire line construction, search and rescue, ventilation, operations, salvage and overhaul, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

37.     During training, practice operations, and when responding to calls, Brickhouse wore firefighter turnout gear treated and/or coated with one or more PFAS chemicals throughout his career.

38.     Upon information and belief, the turn out gear used by firefighters at the Asheville Fire Department, including Brickhouse, was manufactured and/or distributed by Defendants Globe, Gore, and Morning Pride, among other manufacturers and distributers.

39.     Brickhouse's turnout gear included bunker pants, coat, suspenders, hood, gloves, boots, and a helmet.  When not being worn, the gear was kept at the fire station, where the PFAS chemicals in the gear would off-gas, causing inhalation exposure pathways.

40.     During training, Brickhouse was exposed to one or more PFAS chemicals through his use and deployment of Class B, AFFF foam, where he was instructed on how to use the foam product, prepare it and spray it.

41.     Brickhouse was unaware that the turnout gear he wore or the Class B foam used in training contained PFAS.  Brickhouse was unaware that he was being exposed to PFOS, PFAS, and other PFAS chemicals at his training and at his job on a daily basis. Brickhouse was given no warning as to the dangers or possible health effects of exposure to the PFAS chemicals in either the gear or the foam.

## II.     Detrimental Health Impacts to Brickhouse

42.     During and after his service with the Asheville Fire Department, Brickhouse was diagnosed and received treatment for several medical conditions, which Plaintiff now understands to be related to PFAS exposure.

43.     In the fall of 2020, at age 58, Brickhouse began treatment for aggressive prostate cancer, and in November of 2020, Brickhouse underwent a radical prostatectomy. As he still had

positive PSA readings even after the surgery, he had to take approximately 7 months off of work, forcing him to use all of his accrued sick time and over 450 hours of accrued vacation time that he lost due to the illness.

44.     Due to the aggressive prostate cancer illness, Plaintiff was forced to take early medical retirement.

45.     After the radical prostatectomy, Brickhouse suffered from fatigue, hot flashes, loss of sexual drive, loss of weight of approximately 20 pounds from a healthy weight of approximately 250 pounds, incontinence, anxiety and depression for which he has received therapy and medication, all of which conditions continue to present.

46.     While trying his best to recover from aggressive prostate cancer, Plaintiff was diagnosed in 2021 with lymphatic cancer, predominately in the trunk region, and underwent 36 radiation treatments over a seven-week period.

47.     In 2022, Brickhouse was diagnosed with invasive moderated to poorly differentiated squamous cell carcinoma of the right base of tongue mass.

48.     Plaintiff underwent 34 radiation treatments and 3 to 4 chemotherapy rounds for his throat cancer.

49.     Since these cancer treatments, Plaintiff has had to undergo iron infusions for anemia.

50.     Plaintiff has lost his sense of taste, smell, and experienced difficulties with his salivary glands functioning properly due to the cancer and its treatments.  Plaintiff has never had Covid, nor has his wife, and they remain fully vaccinated against that disease.

51.     Plaintiff has continued to lose weight and has not been able to regain it, due to the cancer and its treatment, and has now lost another approximately 35 pounds, weighing approximately 195 pounds, from his normal weight of 250 pounds.

52.     Since these cancer treatments, Plaintiff in November 2022 had to be given fluids for 3 weeks due to dehydration.

53.     From the time of the prostate cancer surgery, to present, Plaintiff continues to suffer from incontinence daily that his doctors believed would resolve within months of the prostate surgery, loss of/low sex drive, fatigue, anxiousness, depression, and continued weight loss, and lack of major senses of taste and smell, along with other medical and emotional issues.

54.     Brickhouse has just been diagnosed with precancerous Barrett's Esophagus.

## III.     Firefighter Exposure to PFAS

55.     Firefighters wear turnout gear to provide a degree of thermal, chemical, and biological protection. Turnout gear includes a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner to protect the firefighter from ambient heat.[4]

56.     PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell of turnout gear as well as chemical, liquid, and bloodborne pathogen resistance to the moisture barrier.

57.     Due to exposure to heat, water and other elements, these PFAS chemicals off-gas, break down, and degrade into highly mobile and toxic particles and dust;[5] also, allowing them to

---

[4] *What Materials Go Into Making Turnout Gear?,* Globe MSA Safety Website, (last visited November 2, 2022), https://globe.msasafety.com/selecting-your-near/materials.
[5] A.S. Young et al., *Per- and Polyfiuoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.ore/10.1038/s41370-021-00288-7.

permeate the moisture-wicking, breathable inner thermal layer and that can cause substantial dermal contact to the firefighter.[6]

58.     Firefighters are exposed through inhalation of off-gassed PFAS chemicals, ingestion of the chemicals, and through normal workplace activities, as particles from their turnout gear spread to fire response vehicles and stations, as well as the Class B foam used, and gear kept in firefighters' personal vehicles and homes, in training and on the job.[7]



Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

59.     Workplace exposure to PFAS or PFAS-containing materials at toxic levels has been known for decades by the manufacturers of the chemicals. As early as July 31, 1980, Old DuPont officials documented measures needed to prevent workplace exposure to PFOA, acknowledging that the chemicals could permeate all protective materials, with toxicity varying based on the exposure pathway. The document acknowledged that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded, "continued exposure is not tolerable."

---

[6] *Id.*
[7] *Id.*

60.     A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed, and sold in 2008, 2014, and 2017 by six turnout gear makers, including Defendants MSA (under the Globe name) and Lion, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Brickhouse.[8]

61.     Firefighters with the Asheville Fire Department, including Brickhouse, wore turnout gear manufactured by Defendants Globe, Gore, and Morning Pride, and others in the ordinary course of performing their duties as the gear was intended to be used and in a foreseeable manner, which exposed Brickhouse and others to significant levels of PFAS.

62.     Brickhouse did not know and in the exercise of reasonable diligence could not have known that the turnout gear he wore and used contained PFAS or PFAS-containing materials, and similarly did not know nor could have known that he was routinely exposed to PFAS or PFAS containing materials.

63.     Brickhouse did not know and in the exercise of reasonable diligence could not have known that the AFFF foam he trained with, used on the job and had to clean up at the station contained PFAS or PFAS-containing materials, and similarly did not know nor could have known that he was routinely exposed to PFAS or PFAS containing materials.

64.     The turnout gear worn or used by Brickhouse did not and does not contain labels that indicate the gear contains PFAS, and similarly did not warn Brickhouse of the health risks associated with exposure to PFAS.

---

[8] Graham F. Peaslee, et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles* pp. 594-599 (Environmental Science & Technology Letters (June 23, 2020)), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410?ref=pdf (hereinafter the "Notre Dame Turnout Study").

65.     Additionally, PFAS-containing Class B foam is used routinely in firefighting training as well as in fire extinguishment and can result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high depth), or kneeling in Class B foam during use. As a result, firefighters can be exposed to PFAS through skin contact, inhalation, or ingestion.

66.     As alleged herein, Brickhouse was also exposed to Class B foam during his training and work with the Asheville Fire Department, including as described above.

67.     Brickhouse did not know and in the exercise of reasonable diligence could not have known that the Class B foam he was exposed to in training and other work contained PFAS or PFAS-containing materials, and similarly did not know nor could have known that he was exposed to PFAS or PFAS-containing materials in the Class B foam.

68.     These exposures to PFAS or PFAS-containing materials for nearly two decades more likely than not caused or contributed to Brickhouse developing cancer, and other health conditions described herein.

IV.     **Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS**

69.     Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in turnout gear and PFAS containing Class B foam, throughout the United States and in North Carolina.

70.     PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA") and selling it to other companies, including Old DuPont.

71.     By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this widespread use, PFAS had never been detected in the environment nor were present in human blood or bodies.

72.     In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world, with 3M as one of the largest manufacturers.

73.     In the 1970s, Defendants National Foam and Tyco began to manufacture, market, and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

74.     Founded in 1918, Defendant MSA (under the Globe name) later began manufacturing, marketing, and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA (under the Globe name) continues to manufacture, market, and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[9]

75.     Defendant Lion began to manufacture, market, and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets, and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendant Chemours (a spin-off from Old DuPont), DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.[10]

---

[9]  *See Globe History,* Globe MSA Safety Website, (last visited November 2, 2022), https://globe.msasafetv.com/history; *Turnout Gear Materials,* Globe MSA Safety Website, (last visited November 2, 2022), https://globe.msasafetv.com/materials.
[10] *See Our History,* Lion Website (last visited November 2, 2022), http://www.lionprotects.com/lion-histow; *Firefighter Turnouts,* Lion Website (last visited November 2, 2022), https://www.lionprotects.com/firefighterturnout-gear.

V.    **Defendants Knew And Have Known That Exposure to PFAS Cause Serious Health Impacts**

76.    Defendants have long known about the serious and significant impacts to health caused by exposure to PFAS. Defendants 3M and Old DuPont (and associated spin-offs and subsidiaries, namely Defendants New DuPont, Corteva, and Chemours) conducted multiple studies on the exposure of the health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed internally but were not reported to the public or to regulatory agencies.

77.    Those internal 3M and Old DuPont findings include:

   a.    A 1950 3M study showed that PFAS could build up in the blood of mice and could bind to proteins in human blood, suggesting that PFAS would not only remain, but persist and accumulate, in the body of the exposed individuals with each additional exposure.[11]
   b.    In 1961, a toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were duplicated in studies with dogs.
   c.    In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."
   d.    In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish involved in the experiment died.
   e.    In the 1970s, Old DuPont discovered that there were high concentrations of PFOA in the blood samples of workers at DuPont's Washington Works site.
   f.    By the end of the 1970s, studies performed by 3M indicated that PFOA was "completely resistant to biodegradation."[12]
   g.    In 1981, 3M, which still supplied PFOA to Old DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to Old DuPont. Old DuPont then tested the children of pregnant employees in their Teflon divisions and found that of seven births between 1979 and 1981, two children had eye defects. Defendants reassigned 51 female employees but did not inform EPA or make this information public.
   h.    In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M had represented.[13] Subsequently,

---

[11] Timeline – *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPontTimeline_sm.pdf; *see also,* https://www.ewg.org/pfastimeline/.

[12] *PFCS: Global Contaminants: PFCs Last Forever,* Environmental Working Group, (last visited November 10, 2022), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.

[13] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of

a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable," but the company continued to sell them."[14]

i.   By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and Old DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant Old DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

j.   In the 1990s, Defendant Old DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

k.   In response to the alarming and detrimental human health impacts, DuPont began to develop an alternative to PFOA. In 1993, DuPont circulated an internal memo announcing that "for the first time, we have a viable candidate" that appeared to be less toxic and with less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[15]

l.   On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[16]

78.    These decades of research and internal studies show that Defendants, including 3M and DuPont (all iterations) in particular, knew of the harmful impacts of PFAS chemicals both to the environment and humans, yet continued to manufacture, develop, market, distribute, supply and/or sell products contaminated with PFAS chemicals.

79.    Additionally, these studies by Defendants, including by 3M and Old DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bioaccumulation, and linked increased incidence of liver damage, various cancers, and birth defects in humans to PFAS exposure.

---

Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), p.8
https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG116-GO28-Transcript-20190910.pdf.
[14] *Id.*
[15] *Id., p.47.*
[16] Internal Old DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000),
https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

80.    In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process, or distribute chemicals to immediately report to the U.S. Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, the public, its customers, or end users, like firefighter Brickhouse, of the health impacts resulting from exposure to PFAS.

81.    In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."[17]

82.    However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. Further, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS.

83.    By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

84.    In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

---

[17] *EPA and 3M Announce Phase Out of PFOS,* Press Release, United States EPA (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.

2:23-cv-04513-RMG      Date Filed 09/07/23      Entry Number 1      Page 32 of 60

85.     As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . .. The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.[18]

86.     Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight and public attention to the risks posed by their products. In March 2001, 3M informed attendees at National Fire Protection Association's Technical Meeting on Foam, including Class B foam manufacturer Defendants Tyco, Chemguard and National Foam, that 3M was discontinuing its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.

87.     Rather than acknowledging the toxicity of its product, Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe.

---

[18] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

88.     Defendants' turnout gear manufacturers, such as MSA (Globe) and Lion, partnered with Old DuPont and with Defendant Gore to develop, manufacture, market, distribute and sell turnout gear made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[19]

89.     In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, and Arkema, to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[20]

90.      "C8" is a name given to PFOA because it has eight carbon atoms, In 2011, the C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case began releasing its findings.[21] The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol, and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

91.     In 2015, Old DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, Old DuPont required Chemours to indemnify New DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold New DuPont

---

[19] *DuPont and Lion Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and Lion (January 30, 2013), https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; *Our Partners*, Globe Website (last visited November 2, 2022), https://globe.msasafety.com/our-partners; and *Firefighter & Emergency Response Protection,* DuPont Website (last visited November 2, 2022), https://www.dupont.com/personal-protection/firefighter-protection.html.
[20] *PFOA Stewardship Program*, United States EPA (last visited November 2, 2022), https://www.epa.gov/assessingand-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.
[21] *See generally, C8 Science Panel,* http://www.c8sciencepanel.org/panel.html (last visited November 14, 2022).

accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[22]

92.     In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the U.S. Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, [and] are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[23]

93.     In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the New DuPont (what was left of Old DuPont after spinning off Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew nothing about Old DuPont's efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier. Finally, he stated that any liabilities from Old DuPont's PFAS operations were now Chemours' problem.[24]

---

[22] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), p.27
https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG116-GO28-Transcript-20190910.pdf.
[23] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases*, Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-militaryfact-sheet- ucs-2018.pdf.
[24] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), p.28, 32.
https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.

94.     To date, there is no safe, acceptable, or "normal" level of PFAS in the human body. Further, the fact that PFOA and PFOS are often found together with other PFAS chemicals presents a substantial risk to human health due to exposure to these chemicals, as has occurred to Plaintiff from his regular use of AFFF and turnout gear for over 16 years.

## VI.    Defendants Failed to Warn Brickhouse of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe

95.      As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life- threatening diseases, including cancer.

96.      Defendants ***did not warn*** firefighter Brickhouse or any other firefighter that PFAS and PFAS-containing products, including turnout gear or Class B foams used by Brickhouse, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

97.      Defendants have falsely represented—and continue to falsely represent— that PFAS and PFAS-containing turn out gear and Class B foam are safe and not harmful to humans or the environment. Some pertinent examples include:

    a.  2021 - In a New York Times article, Defendant W. L. Gore maintained that its turnout products were safe.[25]

    b.  2021 - Defendant Lion stated that the representations articulated by its consultant Paul Chrostowski in 2020 reflect its position: "Dr. Chrostowski's report says it all for Lion."[26]

    c.  2021 - Defendants MSA Globe and W. L. Gore have continued to state that their products have been tested and are safe.[27]

---

[25] Hiroko Tabuchi, Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic, New York Times, (January 26, 2021), https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html.

[26] David Ferry, The Toxic Job of Being A Hero, Men's Health, (September 21, 2021), https://www.menshealth.com/health/a37624731/cancer-firefighter-gear-pfas/.

    d.  2022 - Defendant 3M stated that it was not "necessary or appropriate" to declare any PFAS hazardous.[28] It also states on its website that: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels....Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS....It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA causes harm to people at current or historical levels. Although PFAS have been detected in the environment at extremely low levels, their mere presence does not mean they are harmful.... Although it has been widely reported that no causal connection has been identified between exposure to PFOS or PFOA and harm to people's health, there is a great deal of misinformation in the public domain.... The findings of the C-8 science panel are also frequently misunderstood."[29]

    e.  2022 - DuPont and Chemours also continue to assert that there is little scientific evidence to support that PFAS and/or certain PFAS, like fluoropolymers, are harmful to human health.[30]

    f.  2022 - DuPont maintains that turnout gear keeps firefighters safe and "protect(s) against the intrusion of...chemicals."[31]

98.    Most recently, on June 15, 2022, the U.S. EPA issued a Health Advisory setting a new interim lifetime exposure limit for perfluorooctane sulfonic acid (PFOS) and perfluorooctanoic acid (PFOA) in drinking water at 0.02, 0.004 parts per trillion (ppt) respectively.[32]

---

[28] Jim Spencer, 3M's Support for PFAS Could Cost Taxpayers Billions of Dollars, Star Tribune (September 11, 2021), https://www.startribune.com/3m-s-support-for-pfas-could-cost-taxpayers- billion-of-dollars/600096094/.

[29] 3M website, PFAS Stewardship – Health Science (last visited November 3, 2022), https://www.3m.com/3M/en_US/pfas-stewardship-us/health-science/.

[30] DuPont website, Information on PFAS (last visited November 3, 2022), https://www.pp.dupont.com/pfas/whatgovernmental-agencies-say.html; Chemours website, Our Commitment to PFAS Stewardship (last visited November 3, 2022), https://www.chemours.com/en/corporate-responsibility/sustainability-safety/our-commitment-to-pfasstewardship.

[31] Id. at DuPont website (last visited November 3, 2022), https://www.pp.dupont.com/knowledge/dupont-technology-in-your-turnout-gear.html.

[32] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances (PFAS), U.S. EPA, June 15, 2022, https://www.epa.gov/system/files/documents/2022-06/prepublication-four-pfas-june-2022.pdf.

**Defendants Provide No Accurate Safety Warnings**

99.     A Material Safety Data Sheet (or "MSDS") is a document that provides  health and safety information about products, substances, or chemicals that are classified as hazardous substances or dangerous goods.

100.     Upon information and belief, Plaintiff alleges that no MSDS has been prepared for the turnout gear manufactured and distributed by Defendants, or if so, contains no PFAS chemical information.  Despite decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS or Class B foams and turnout gear made with or containing PFAS.

101.     Despite decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS or Class B foams and turnout gear made with or containing PFAS.

102.     Upon information and belief, the MSDS instead stated that the Class B foams and/or their contents are not known carcinogens and do not cause birth defects. Upon information and belief, the MSDS do not reflect the known serious health risks and hazards associated with exposure to PFAS in these Class B foams.

**VII.   Firefighters are at Significant Risk of Harm From Exposure to PFAS in Class B foam and Turnout Gear**

103.     In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest nongovernmental organizations dedicated to improving global chemical waste

policies, published a scientific paper that explains: "firefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce."[33] The panel concluded that "ongoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "bio-accumulation and very slow bioelimination may be very significant influencing factors in PFHxS exposure" in firefighters.[34] "Of greater concern," the panel observed, "is that firefighter blood levels for PFOS and PFHxS are many times higher than the median values for the general...population."[35]

104.    For example, in 2017, the International Association of Fire Fighters ("IAFF") issued a statement that both mischaracterizes and purports to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnout gear and Class B foam are minimal to non-existent.[36] The statement even encourages firefighters to continue to use legacy gear and foams, creating a false sense that these PFAS-containing foams and turnout gear are safe. The statement reads, in relevant part:

> PFOA may also be present as a manufactured component of legacy turnout gear. The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy**

---

[33] *Id.* at p. 25.

[34] *Id.*

[35] *Id.*

[36] The IAFF maintained this position until January 2021 when IAFF members demanded that the IAFF leadership hold turnout and Class B foam manufacturers accountable. In July 2021, new IAFF President Edward Kelley made clear that the cancer rates of firefighters is unacceptable and that IAFF is actively working to rid the fire service of the toxic PFAS found in firefighting foams and turnout gear. "The data is becoming clearer. The gear that's supposed to be protecting us is poisoning us. It defies logic." IAFF, Address by IAFF General President Edward Kelly, Facebook (July 16, 2021), https://www.facebook.com/IAFFonline/videos/180233720677454.

**turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.[37]

105.    The IAFF maintained the Defendants' position that the turnout gear and Class B foam was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, Plaintiff did not know and, in the exercise of reasonable diligence, could not have known that the turnout gear and Class B foam used contained PFAS or PFAS-containing materials.

106.    In June 2020, scientists at the University of Notre Dame published a groundbreaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA (Globe) and LION, over several production years, as listed below:[38]

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

---

[37] International Association of Firefighters, Statement on PFOA and Turnout Gear (May 2017), https://tinyurl.com/y29mfh69.
[38] Notre Dame Turnout Study, *supra* note 12.

107.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."[39]

108.    According to the researchers, "these PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[40] The study found significant levels of PFAS chemicals – including PFOA and PFOS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[41]

109.    "Garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[42] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnout gear.

110.    This finding poses a health exposure concern not only for firefighters that rely on turnout gear to protect them from heat, fire, water, and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnout gear as the result of home washing or storage.

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*

111.    Lead researcher Dr. Graham Peaslee commented that the turnout gear tested contain "the most highly fluorinated textiles I've ever seen"[43] and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[44]

112.    A recent Harvard study examining PFAS levels in fire stations dust found that "dust in turnout gear locker areas and adjoining apparatus bays had significantly higher fluorine concentrations compared to living rooms in fire stations."[45]

**FIRST CAUSE OF ACTION**
**PRODUCTS LIABILITY - DEFECTIVE DESIGN**

113.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint as if restated in full therein.

114.    At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling, of fluorochemical products.

115.    At all times pertinent to this Complaint, Defendants regularly participated in placing the fluorochemical products into the American stream of commerce.

116.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of fluorochemical products, Defendants owed a duty to all persons whom

---

[43] Raleigh McElvery, Protective Gear Could Expose Firefighters to PFAS, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[44] Andrew Wallender, Firefighters Face New Possible Risk From Toxic PFAS: Their Gear, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-theirgear.

[46] Anna S. Young *et al.,* Per- and polyfluoroalkyl substances (PFAS) and total fluorine in fire station dust, Journal of Exposure Science & Environmental Epidemiology (February 5, 2021), https://www.nature.com/articles/s41370-02100288-7.

Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, and/or market any product which is unreasonably dangerous for its intended and foreseeable uses.

117.    Plaintiff used Defendants' fluorochemical products in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

118.    Defendants' fluorochemical products used by Plaintiff did not perform as safely as an ordinary consumer would have expected the products to perform when used as Plaintiff did in an intended or in a reasonably foreseeable manner because PFOA and PFOS are carcinogens and exposure to these chemicals are harmful to human health, and so impacted the Plaintiff and his health as described herein.

119.    Defendants' defective design of the fluorochemical products was far more dangerous than Plaintiff or an ordinary consumer would expect when used, as Plaintiff did, in an intended and reasonably foreseeable manner. While historical research centered on environmental impacts and exposures associated with PFAS and PFAS-containing products, recent studies have focused on the health impacts to firefighters stemming from their occupational exposure to PFAS containing turnout gear and Class B foam.

120.    Defendants' fluorochemical products failure to perform safely was a substantial factor in causing Plaintiff's harm.

121.    Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain harmful fluorochemicals.

122.    These alternative designs and/or formulations were available, practical, and technologically feasible.

123.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by Defendants' manufacture, marketing, and/or sale of fluorochemical products.

124.    The use of PFAS-free alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by Defendants' manufacture, marketing, and/or sale of fluorochemical laden products.

125.    The risks of fluorochemical products were not obvious to users of the AFFF, nor were they obvious to users in the vicinity of the AFFF use, including Plaintiff, who were unwittingly exposed to Defendants' toxic and carcinogenic chemicals. Plaintiffs could not have reasonably discovered the defects and risks associated with the use of fluorochemical products and could not protect themselves from exposure to Defendants' fluorochemical products.

126.    As a direct and proximate result of Defendants' defective design, Plaintiff, has suffered and continues to suffer some or all of the following damages:

a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

 b. Physical injury, both temporary and permanent, including cancer as described herein;

c. Economic Damages;

d. Severe and significant emotional distress and mental pain and suffering;

e. Loss of enjoyment of life and other annoyance and inconvenience.

127.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

128.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

43

## SECOND CAUSE OF ACTION
## PRODUCTS LIABILITY – DEFECTIVE DESIGN - RISK BENEFIT

129.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint as if restated in full therein.

130.    At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling, of fluorochemical products.

131.    At all times pertinent to this Complaint, Defendants regularly participated in placing the fluorochemical products into the American stream of commerce.

132.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of fluorochemical products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

133.    Defendants' fluorochemical products were defectively designed and manufactured when the products left the hands of Defendants, such that the foreseeable risks associated with the use, storage, and disposal of the fluorochemical products exceeded the alleged benefits associated with its design and formulation.

134.    At all times relevant to this litigation, Defendants' fluorochemical products reached Defendants' intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

135.    Defendants' fluorochemical products failure to perform safely was a substantial factor in causing Plaintiff's harm.

136.    These alternative designs and/or formulations were available, practical, and technologically feasible.

137.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by the Defendants' manufacture, marketing, and sale of fluorochemical products.

138.    The fluorochemical products manufactured, sold, or distributed by the Defendants were defective in design because the foreseeable risk of harm posed by the fluorochemical products could have been reduced or eliminated by the adoption of a reasonable alternative design.

139.    As a direct and proximate result of Defendants' defective design, Plaintiff, has suffered and will continue to suffer some or all of the following damages:

    a.  Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

    b.  Physical injury, both temporary and permanent;

    c.  Economic damages;

    d.  Severe and significant emotional distress and mental pain and suffering;

    e.  Humiliation, embarrassment and fear;

    f.  Loss of enjoyment of life; and

    g.  Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

140.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

141.    Further, Defendants' acts and knowledge of defective design were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

## THIRD CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

142.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint as if restated in full therein.

143.    Defendants knew or should have known that exposure to fluorochemical products presented a substantial danger when used because it is hazardous to human health and the environment.

144.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling fluorochemical products would result in physical harm to Plaintiff.

145.    Ordinary consumers, including Plaintiff, of Defendants' fluorochemical products would not have recognized the risks.

146.    Defendants failed to adequately warn Plaintiff of the potential risks of fluorochemical products.

147.    Adequate instructions and warnings on the fluorochemical products could have reduced or avoided these foreseeable risks of harm to Plaintiff's health.

148.    Had Defendants provided adequate warnings, Plaintiff could have taken measures to avoid or lessen the exposure to PFAS contained in the Class B foam and his turnout gear.

149.    The lack of sufficient warnings was a substantial factor in causing Plaintiff's harm.

150.    Defendants' failure to warn was a direct and proximate cause of Plaintiff's cancer.

151.    Defendants' products were defective in design and unreasonably dangerous because Plaintiff was not warned nor given notice of the risks and such failure to warn resulted in, among other reasons:

46

a. Defendants' products were defective in design and formulation and, as a result, failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect;

b. Defendants' products were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate;

c. Defendants' products cause extensive and persistent PFAS contamination when used in a reasonably foreseeable and intended manner;

d. Brickhouse was exposed to these PFAS-containing products in the ways that Defendants intended them to be used and for the ordinary purposes for which these products were intended;

e. Brickhouse was exposed to these PFAS-containing products in ways that were foreseeable to Defendants.

152.  Defendants' failure to provide adequate and sufficient warnings for the fluorochemical products that they manufactured, marketed, and sold renders the fluorochemical products defective products.

153.  As a direct and proximate result of Defendants' defective design, Plaintiff, has suffered and will continue to suffer some or all of the following damages:

a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

b. Physical injury, both temporary and permanent;

c. Economic Damages;

d. Severe and significant emotional distress and mental pain and suffering;

e. Humiliation, embarrassment and fear;

f. Loss of enjoyment of life; g. Annoyance and inconvenience; and

h. Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

154.    Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights and health of Plaintiff.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE

155.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint as if restated in full therein.

156.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of fluorochemical products, Defendants owed a duty to Plaintiff to exercise reasonable care in the instructing, labeling, and warning of the handling, control, use and disposal of Defendants' fluorochemical products.

157.    Defendants voluntarily assumed a duty towards Plaintiff by affirmatively representing to Plaintiff that Defendants previously detailed acts and/or omissions were not causing any physical harm or other damage to him, and that Defendants' fluorochemical products were safe to use.

158.    Defendants' fluorochemical products are inherently dangerous substances and Defendants owed a duty of care towards the Plaintiff that was commensurate with the harmful nature of the fluorochemical products and the dangers involved with exposure to fluorochemical products.

159.    Defendants failed to correct, clarify, rescind, and/or qualify its representations to Plaintiff that Defendants' acts and/or omissions were not causing any physical harm and/or damage to him, or that the fluorochemical products were safe to use.

160.    Despite knowing that their fluorochemical products are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants failed to use reasonable care when they: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold fluorochemical products; (b) issued instructions on how fluorochemical products should be used and disposed of; (c) failed to recall and/or warn the users of fluorochemical products of the dangers to human health and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their fluorochemical products.

161.    But for Defendants' negligent acts and/or omissions and breach of their standard of care to produce a safe product, Plaintiff would not have been exposed to unhealthy levels of fluorochemicals.

162.    Defendants' failure to act with reasonable care to (1) design a product to perform safely; (2) failure to issue an adequate warning or instruction on the use of fluorochemical products warning and; (3) failure to issue a recall, were substantial factors in causing Plaintiff's harm.

163.    Defendants knew or reasonably should have known that Plaintiff would not realize the danger Defendant's fluorochemical products posed to human health.

164. A reasonable manufacturer or distributor under the same or similar circumstances would have warned of the danger.

165. Defendants' negligent acts and omissions directly and proximately caused Plaintiff's cancer and continue to directly and proximately cause damage to Plaintiff in the form of severe personal injuries, pain, suffering, loss of consortium and emotional distress.

166. Plaintiff is reasonably certain to have future permanent and lasting detrimental health effects due to Plaintiff's present and past injuries directly and proximately caused by Defendants' negligent acts or omissions.

167. It has been reasonably foreseeable to Defendants for at least several decades that Defendants' negligent acts and/or omissions would directly and proximately cause bodily injury and economic damage to Plaintiff including the injuries and damages that Plaintiff suffers from.

168. Defendants were conscious of the dangers of fluorochemical products, and its negligent acts or omissions, and were conscious that bodily injury to Plaintiff would or was likely to result from the fluorochemical products and Defendants' negligent acts and/or omissions. Nevertheless, with reckless indifference to these consequences, and as previously detailed, Defendants consciously and intentionally acted negligently and/or omitted the duties Defendants knew it owed to Plaintiff, other exposed individuals, and the public at large, and Plaintiff was harmed as a result.

169. The acts and omissions of Defendants were negligent, intentional, reckless, malicious, willful and/or wanton, and as a direct and proximate result Plaintiff, has suffered and will continue to suffer some or all of the following damages:

a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

b. Physical injury, both temporary and permanent;

50

c. Economic Damages;

d. Severe and significant emotional distress and mental pain and suffering;

e. Humiliation, embarrassment and fear;

f. Loss of enjoyment of life;

g. Annoyance and inconvenience; and

h. Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

## FIFTH CAUSE OF ACTION
## CONCEALMENT MISREPRESENTATION AND FRAUD

170.     Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

171.     Defendants knowingly, intentionally, maliciously, willfully, wantonly, recklessly and/or negligently failed and/or refused to advise Plaintiff of the dangers and/or health risks posed by Defendants' fluorochemical products.

172.     Defendants negligently, knowingly, maliciously, willfully, wantonly, recklessly, intentionally, and/or negligently withheld, misrepresented, and/or concealed information regarding Defendants' fluorochemical products from Plaintiff who had a right to know of information which would have prevented Plaintiff from being exposed and/or continuing to be exposed to the fluorochemical products.

173.     For at least several decades, Defendants had knowledge or the means of knowledge that Defendants' fluorochemical products were causally connected with or could increase the risk of causing damage to humans and animals, including knowledge of statistically significant findings

51

showing a causal connection between exposure to fluorochemical products and physical injuries in humans and animals.

174.    In connection with the fluorochemical products, Defendants have had and continue to have a general duty of care to disclose to Plaintiff the actual and potential harm to their persons as a direct and proximate result of Defendants' acts and/or omissions, including a general duty of care to disclose to Plaintiff that Defendants had, and were continuingly, exposing Plaintiff to harmful levels of fluorochemicals.

175.    Defendants voluntarily assumed a duty to disclose to Plaintiff the actual and potential harm to his body as a direct and proximate result of Defendants' acts and/or omissions, including a duty to disclose to Plaintiff that Defendants had exposed, and were continuingly exposing Plaintiff to harmful fluorochemical products, which duty was voluntarily assumed by affirmatively representing to Plaintiff that the Defendants and their fluorochemical exposure were harmless, when Defendants knew and/or reasonably should have known that the Defendants' fluorochemical products caused, and were continuing to cause, bodily injury.

176.    Through Defendants' superior knowledge, responsibility, and/or control over the fluorochemical products, and Defendants' voluntary actions and/or representations, a relationship of trust and confidence existed between Defendants and Plaintiff.

177.    Despite Defendants' knowledge regarding fluorochemical exposure, and despite Defendants' duties to disclose to Plaintiff, Defendants negligently, maliciously knowingly, willfully, wantonly, recklessly and/or intentionally withheld, misrepresented, and/or concealed information from Plaintiff regarding exposure to fluorochemical products.

178.    Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure from Plaintiff with the intention to mislead and/or defraud him into

believing that their fluorochemical exposure was not harmful, and to mislead and/or defraud him into continuing to use the fluorochemical products.

179.    Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure that was a substantial factor in causing Plaintiff's harm.

180.    As a direct and proximate result of the aforesaid acts and/or omissions by Defendants, acting for and on its own behalf and as agent, ostensible agent, employee, conspirator and/or joint venture of others, Plaintiff was exposed to Defendants' fluorochemical products and was injured.

181.    Defendants not only withheld, misrepresented, and/or concealed material information from Plaintiff but also committed fraud against Plaintiff by affirmatively representing to Plaintiff that their fluorochemical products were harmless and/or did not present any risk of harm, when Defendants knew, reasonably should have known, and/or with utter disregard and recklessness as to whether it was true or not, that Defendants' fluorochemical products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Plaintiff.

182.    Defendants' representations to Plaintiff were knowingly, intentionally, negligently, and/or recklessly false.

183.    Defendants had, and continue to have, a duty of care to provide Plaintiff, with truthful representations regarding the actual and potential harm to his person as a direct and proximate result of Defendants' acts and/or omissions, and Defendants voluntarily assumed a duty of care to provide Plaintiff with truthful representations regarding Defendants' fluorochemical products and the actual and potential harm to his persons as a direct and proximate result of Defendants' acts and/or omissions.

184.     Defendants' affirmative representations and/or omissions to Plaintiff were false and were material to Plaintiff in forming his belief that Defendants' fluorochemical products were safe, in causing him to continue to use the fluorochemical products, and in causing him to not seek treatment and/or ways to remedy his past and continuing exposure to fluorochemical products.

185.     Defendants made the affirmative representations and/or omissions to Plaintiff with the intention that Plaintiff would be misled into relying on such affirmative representations and/or omissions.

186.     Plaintiff relied on Defendants' affirmative representations and/or omissions in forming his belief that Defendants' fluorochemical products were safe in causing them to continue to use the fluorochemical products, and in not seeking treatment and/or ways to remedy his past and continuing exposure to Defendants' fluorochemical products.

187.     Plaintiff was damaged and physically harmed as a direct and proximate result of their justified reliance on Defendants' affirmative, fraudulent representations and/or omissions and, as a direct and proximate result of such justified reliance, Plaintiff continued to use the fluorochemical products.

## SIXTH CAUSE OF ACTION
### NEGLIGENCE PER SE

188.     Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

189.     One or more federal statutes, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e, impose duties of care on Defendants with regard to Defendants' actions and/or omissions towards Plaintiff and/or Plaintiff's safety.

190.    By Defendants' acts and/or omissions resulting in harm to Plaintiff, Defendants' violated and/or continue to violate and/or breach one or more federal statutes and/or duties, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e, constituting negligence per se, including liability for all injuries to Plaintiff associated with the fluorochemical products.

191.    Defendants' violation of law and breach of its statutory duties directly and proximately caused and continue to directly and proximately cause damage to Plaintiff in the form of economic damage and bodily injury for which Defendants are liable.

## SEVENTH CAUSE OF ACTION
### PAST AND CONTINUING TRESSPASS AND BATTERY

192.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

193.    Defendants have known for several decades that their fluorochemical products are harmful and toxic to humans and animals, and once ingested, will remain in a person's body for a long time, including through binding to blood and/or tissues.

194.    Despite such knowledge, Defendants continued to use the fluorochemical products, which caused harmful physical contact with Plaintiff.

195.    Defendants' continued actions with knowledge that such actions will result in harmful physical contact with Plaintiff demonstrate intent and/or reckless indifference by Defendants without regard to the harm they have caused and will cause.

196.    Defendants' intentional acts and/or omissions have resulted in fluorochemicals, in the body of Plaintiff or otherwise unlawful and harmful invasion, contact, and/or presence of

fluorochemicals in Plaintiff's body, which interferes with Plaintiff's rightful use and possession of Plaintiff's body.

197.    The fluorochemicals present in and/or on Plaintiff's body originating from Defendants' fluorochemical products was at all relevant times hereto, and continues to be, the property of Defendants.

198.    The invasion and presence of the fluorochemical products in and/or on Plaintiff's body was and continues to be unconsented and without permission or authority from Plaintiff or anyone who could grant such permission or authority.

199.    Defendants' intentional acts and/or omissions were done with the knowledge and/or belief that the invasion, contact, and/or presence of fluorochemical products onto, and/or into Plaintiff's body were substantially certain to result from those acts and/or omissions.

200.    Harmful contact with Plaintiff's body was the direct and/or indirect result of Defendant's intentional acts and/or omissions.

201.    The presence and continuing presence of the fluorochemical products in and/or on Plaintiff's body is offensive, unreasonable, and/or harmful and constitutes a continuing and/or permanent trespass and battery.

202.    Defendants' past and continuing trespass and battery upon Plaintiff's body directly and proximately caused and continues to directly and proximately cause damage to Plaintiff in the form of bodily injury, for which Defendants' are liable.

### EIGHTH CAUSE OF ACTION
### NEGLIGENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

203.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

204.    Defendants' acts and/or omissions were negligent, intentional, and/or reckless, including Defendants' continued pollution of the environment and resultant exposure of Plaintiff to harmful fluorochemical products, despite knowing that such exposure was causing and would continue to cause harm and/or unacceptable risk of harm to Plaintiff.

205.    Defendants' negligently, knowingly and/or intentionally withheld and concealed material information from and/or affirmatively misrepresented to Plaintiff that they were exposed to harmful fluorochemical products and/or that the fluorochemical products were not causing or creating any risk of harm to them, despite knowing at the time these concealments and/or misrepresentations were made that the fluorochemical products were causing and would continue to cause harm and/or unacceptable risk of harm to persons, including Plaintiff.

206.    At the time of Defendants' negligent, knowing, and/or intentional acts and/or omissions, it was foreseeable to Defendants and Defendants were certain and/or substantially certain that its actions and/or omissions would cause emotional distress to Plaintiff.

207.    Defendants' acts and/or omissions were extreme, outrageous, intolerable, and/or offended the generally accepted standards of decency and morality.

208.    By continuing to expose Plaintiff to harmful fluorochemical products, and continuing to misrepresent to Plaintiff that the fluorochemical products were not and would not cause them harm or risk of harm and/or continuing to withhold and/or conceal from Plaintiff material information on such issues, despite knowing that the fluorochemical products were causing and would continue to cause harm and/or risk of harm, Defendants acted in an extreme outrageous, and intolerable manner which offends generally accepted standards of decency and morality.

209.     Defendants' acts and/or omissions resulting in Defendants' concealment and/or misrepresentations, directly and proximately caused physical harm, and continue to cause physical harm, to Plaintiff.

210.     Defendants' extreme, outrageous and intolerable actions were a substantial factor in causing Plaintiff to suffer severe physical, mental, and emotional distress.

211.     As a direct and proximate result of Defendants' extreme, outrageous and intolerable actions, Plaintiff has and will continue to suffer severe physical, mental, and emotional distress.

212.     No reasonable person,  including Plaintiff, could be expected to endure the mental anguish caused by the knowledge that entities have negligently, knowingly, and/or intentionally exposed them to years of harmful contact with AFFF containing PFOA or PFOS and/or their precursor chemicals, and in Plaintiff's daily use of his turnout gear, and Defendants have furthermore actively misrepresented and/or concealed such danger from them, while reaping hundreds of millions of dollars in profits as a direct and proximate result.

## CLAIM FOR PUNITIVE DAMAGES

213.     Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

214.     At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the fluorochemical products that were used by Plaintiff and that resulted in the physical bodily injuries that Plaintiff has suffered and will continue to suffer.

215.     The willful, wanton, malicious, and/or reckless conduct of Defendants, includes, but is not limited to:

a. issuing no warnings and failing to divulge material information concerning the release of fluorochemicals, including but not limited to PFOA and PFOS;

b. failing to take all reasonable measures to ensure fluorochemical products would be used effectively and properly disposed of; and

c. failing to prevent the foreseeable impacts of fluorochemical exposure upon the Plaintiff.

216.    As a result of Defendants' conduct, Plaintiff has been forced to incur and will continue to incur significant costs related to the harm caused by Defendants' fluorochemical products and will continue to suffer serious, debilitating, and severe physical, mental, and emotional distress of his cancer caused by Defendants' fluorochemical products.

217.    Defendants have demonstrated an outrageous conscious disregard for the physical safety of Plaintiff and acted with implied malice, warranting the imposition of punitive damages.

218.    Upon information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award the Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

### **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A. Compensatory damages that exceed the jurisdictional limit of this court;

B. Punitive damages that exceed the jurisdictional limit of this court;

C. Reasonable fees for attorneys and expert witnesses;

D. Costs and disbursements of this lawsuit;

E. Interest on the damages according to law; and

F. Any other and further relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated:  September 7, 2023.

LAW OFFICE OF F. BRYAN BRICE, JR.

By: _____

F. Bryan Brice, Jr.
bryan@attybryanbrice.com
N.C. State Bar No. 17840
Law Offices of F. Bryan Brice, Jr.
130 S. Salisbury Street
Raleigh, NC 27601
Telephone: (919) 754-1600
Facsimile: (919) 573-4252
*Attorney for Plaintiff*